DANIEL, J., dissentiente. *Page 303 
The prisoner was indicted for the willful murder of one Madison, Johnson. On the trial the following evidence was introduced, to wit:
Alfred Johnson, a brother of the deceased, was examined for the State, and testified that, on a certain evening in the month of March last, he went to the house of Hagar Nutt, in the town of Wilmington; that Alfred Smith, Henry Cowan, James Holmes, the deceased, and the prisoner were there; and after remaining a short time left and went off together, Holmes, Smith and Cowan being a little (410) ahead, and the deceased the prisoner and witness walking on a short distance behind; that it was in the night, with no moon, but a bright start light; that the deceased and the prisoner had some words but did not quarrel nor seem angry that the prisoner struck the deceased, upon which he fell and immediately expired, that the prisoner ran off, but returned upon his calling him, and as soon as he saw the deceased was cut and bleeding he ran off again; that he had never heard the deceased threaten the prisoner, and that the parties did not touch each other until the prisoner, struck the deceased; that the deceased had no weapon in his hand, and none was found on his person after his death.
Alfred Smith, another witness for the State, testified that he was at Hagar Nutt's at the time spoken of by the first witness, and went off in company with the others; that the deceased did not start with them, but came through a gate on the premises and called for the prisoner, who at first did not answer, but upon a second call asked the deceased what he wanted, to which he replied by calling him a damned rascal; that the prisoner then asked him what was the matter, and told him to come up and reason the matter before the gentlemen, to which the deceased replied that the gentlemen, to which the deceased replied that the gentlemen had nothing to do with his business; that he walked on a little ahead, and looking back, saw the prisoner moving backwards and forwards, as if they were trying to get together, but Alfred Johnson was between them, keeping them apart; that he heard no angry words, nor saw nor heard any scuffle, but heard the prisoner tell the deceased that the wished to have nothing to do with him; that he did not see the prisoner strike any blow, but saw him running off.
Dr. Dickson was then called, and testified for the State, that the wound was afflicted by a long, narrow, sharp instrument, and from its appearance must have been instantly fatal.
For the prisoner, Henry Cowan, James Holmes, Mr. Grant and Charlotte Mitchell, were examined. Henry Cowan swore that he left Hagar Nutt's in company with the others; that he walked on before and heard the prisoner and the deceased quarreling, and saw Alfred *Page 304 
(411) Johnson trying to prevent a fight; that prisoner backed, and the deceased followed him eight or ten steps up the hill; that he saw the prisoner running off; that he thought the prisoner was afraid of the deceased from his giving back.
James Holmes testified that he left Hagar Nutt's with the others; that the prisoner left the house singing, and the deceased came afterwards calling for the prisoner; that the prisoner asked what he wanted, to which the deceased replied that he would soon let him know; that he saw the prisoner and the deceased moving backwards and forwards as if they wanted to fight, but Alfred Johnson kept them apart; that he saw the deceased stoop down as if he intended to pick up something, and that soon afterwards he saw prisoner running, and asked him what was the matter, to which prisoner replied, "nothing," and witness said to him that he had done something, or he would not run.
Mr. Grant stated, that about three weeks before this transaction, he saw the prisoner and the deceased have a fight, when the deceased struck the prisoner on the head with a brick-bat, and that the prisoner seemed to wish to avoid the fight; that he heard the deceased say he would kill the prisoner, if there were no other negro left in the State, and that he informed the prisoner of the threat.
Charlotte Mitchell swore, that about a fortnight before the killing, the deceased came to her house in company with Alfred Johnson, his brother, and seemed very anxious to see the prisoner, who boarded with her; that the deceased found the prisoner's cap and tore it up, saying that he would serve the prisoner in the same way if he could find him; and that he intended to kill him at the risk of his life; that Alfred Johnson heard this, and told his brother that they could find the prisoner another time; that she also heard the deceased threaten to kill the prisoner the Friday night before his death; that the deceased had been on good terms with a yellow girl named Maria Mitchell, but had had a falling out with her, and she had come to stay at witness' house, where the prisoner was boarding. She testified also that the prisoner was rather a stouter man than the deceased, both being young (412) men. Mr. Elfe stated that he thought that the prisoner and deceased were about the same size. The prisoner, the deceased and all the witnesses except Messrs. Grant and Elfe were colored persons. Upon this case, the prisoner's counsel insisted that the killing was in self-defense, or at most upon a legal provocation, and requested the court to instruct the jury, that if they believed that the deceased had threatened to take the prisoner's life, which was known to the prisoner, and that the prisoner gave back and the deceased followed him, (as stated by the witness Cowan) then the killing was either excusable homicide in self-defense, or at most, a case of manslaughter. *Page 305 
The court instructed the jury, that if Alfred Johnson's account of the transaction were the correct one, it was undoubtedly a case of murder; but if they did not believe his account to be true, then if they found from the evidence of the threats having been used by the deceased, taken in connection with the testimony given by the witnesses Smith, Cowan and Holmes, or either if them, that the deceased was assailing the prisoner in such a manner that he had no means of saving his life or his body from some great hurt, but by killing the deceased, he had a right to do so, and it would be a case of excusable homicide in self-defense; that if they did not take that view of the case, but found that the parties were engaged in a scuffle, during which the prisoner killed the deceased, it was a case of manslaughter; but that if the parties were only trying to get together, and no blows had passed, or if the prisoner had given back and the deceased had followed him as stated by Cowan, but the deceased had stricken no blow, and had no weapon in his hand or about him, and the prisoner struck him with a weapon likely to produce death, then the killing was murder. The jury found the prisoner guilty of murder, upon which he moved for a new trial upon the ground of misdirection. The motion was overruled and sentence of death pronounced, from which the prisoner appealed.
The instructions to the jury seem to be fully (413) responsive to the prayer of the prisoner, and we do not perceive in them, as given, any error to the prejudice of the prisoner. The killing was, unquestionably, not from necessity in defense of the prisoner's person. Lord Hale says, that it must appear plainly by the circumstances of the case, as the manner of the assault, the weapon, or the like, that the party's life was in imminent danger — otherwise, the killing of the assailant is not justifiable self-defense. 1 P. C., 484.
And Mr. East lays it down, "that a bare fear, however well grounded, that another intends kill one unaccompanied with an overt act, indicative of such intention, will not warrant the latter in killing the other by way of prevention; there must be an actual danger at the time." 1 East. P. C., 272. There was here no danger of the prisoner's life or great bodily harm; for the deceased had no deadly weapon, nor any means of doing the prisoner such harm, and they were nearly of the same strength. But notwithstanding the defect of evidence of any contemporaneous purpose or ability, on the part of the deceased, to kill the prisoner, the court left to the jury the inquiry of fact, whether the *Page 306 
deceased was assailing the prisoner in a deadly manner; which the jury found against the prisoner. He has, therefore, no cause of complaint on this point. The instructions asked, are then to be considered in reference to the position, that the killing was not more than manslaughter. The prayer was, that if the deceased had threatened to take the prisoner's life, which was known to him, and he gave back and the deceased followed him, as stated by Cowan, then the killing was only manslaughter. As to the threat it must have been that proved by Grant to have been made three weeks before, as that alone was communicated to the prisoner. We do not perceive how that can mitigate the offense. If it has any effect, it tends to show that the killing was not on heat of blood, but both intentional and of previous purpose; and therefore it would be murder, unless from the threats and the circumstances (414) attending the encounter, it should appear, that it was necessary in self-defense — which we have already seen was not so. But, notwithstanding this consideration, his Honor did beneficently put it to the jury, that if the parties became engaged in a scuffle, during which the prisoner killed the deceased, it would be but manslaughter.
Now, in the case of mutual combat upon words of reproach or other sudden provocation, if one of the parties takes an undue advantage, as by drawing his sword, and making an assault, before another has an opportunity to draw his, it is settled, that it is murder. And so here where one of the parties drew his knife without notice to the other, who expected only a fight without weapons, as the other knew, it would seem, even if they actually engaged in the fight, that the former's stabbing the other must be murder, for it is plain, that the slayer intended a fight as well as the other, but he did not intend a fair fight, as a trial of natural strength, but sought the other's blood. But in this case there was no actual combat prior to the mortal blow. Under the prayer and instructions we are to consider the case, as to this point, upon the testimony of Cowan alone, laying aside that of A. Johnson and the other witnesses. Cowan states that both of the parties were quarrelling [quarreling], and that A. Johnson was trying to prevent a fight between them, when his attention was drawn to them; that he then saw the prisoner back, and the deceased follow him eight or ten steps; that he saw no scuffle nor blow given by either party, but saw the prisoner run off — which was no doubt, immediately after giving the first fatal blow. Upon this evidence, by itself, it is clear, that it is murder. Two men meet in the street, and upon angry words on both sides one of them offers a fight and the other retreats a few steps, but without declining the fight. Instead, however, of fighting, as was expected by the other, without arms, he that retreats, had either during the quarrel drawn his knife and meant by his retreat to draw the other on, or he fell back until he *Page 307 
could draw his knife; and then, without warning his adversary (415) to keep off, and as soon as he got within reach, and before he had made a blow, he stabbed him so as with a single stroke to take his life upon the spot, and immediately fled.
The prisoner not only took an undue advantage of the deceased, but he took it, while he meant the deceased to believe that they were to fight on an equality; which argues, not sudden passion, but a wanton and cruel thirst for blood. If to these circumstances be added that of the deceased's threat three weeks before, the case is rather aggravated than mitigated. For it tends to raise a presumption of a previous mutual grudge, which the one party was then seeking to gratify in an ordinary fight, and the other party to gratify fatally under the pretence of a sudden mutual combat, in which, though his adversary thought it was to be fair, he meant to take, and secretly did take, an undue and fatal advantage.
In consultation it occurred to us at one time, that the case might properly be left to the jury favorably to the prisoner, on the principle ofLevet's case, Cro. Car., 538; which is, that if the prisoner had reasonable ground for believing that the deceased intended to kill him, and under that belief, slew him, it would be excusable or at most manslaughter, though, in truth, the deceased had no such design at the time. To that purpose the jealousy of the deceased, the previous fight in which the deceased took an undue advantage, his threat, his readiness again to quarrel and fight, and the time being night, in which the deceased might be armed without the prisoner's discovering it, would be material. But the Court is satisfied, for several reasons, that the prisoner can take no benefit from that principle.
The belief that a person designs to kill me, will not permit my killing him from being murder, unless he is making some attempt to execute his design, or, at least, is in an apparent situation to do so, and thereby induces me reasonably to think that he intends to do it immediately. Here there certainly was no such purpose then in the mind of the deceased, as he had no weapon of any sort. Nor did the prisoner have any just reason to think that the deceased so designed then; for although it was night, yet it was bright star-light, so that all the company could see each other distinctly, and the prisoner (416) must have seen that the deceased was not armed, or that, at least, he did not appear to be armed. The most, then, that could be made of it would be, that the prisoner may have thought that the deceased might be armed, and, therefore, that he might intend then to kill him. But such a remote conjecture will not authorize one man to kill another. There might have been more in it, if the deceased had been found lurking on the way of the prisoner in the dark, when he could not *Page 308 
tell whether he was armed or not, but might presume from his ill will towards him and the situation in which he was found, that he was. But it cannot apply to case where there is light enough for the parties to know each other, and upon a mutual quarrel they begin a fight, in which neither party appears to be armed, and one of them secretly prepares a deadly weapon, with which he assails and kills the other, who in reality was, as he appeared, not armed. Besides, the prisoner did not allege, in his defense, that he believed at the time that the deceased intended to kill him, and under that belief, that he slew him. He prayed for instructions on the allegation, that the deceased did intend to kill him, and not on the prisoner's reasonable, though mistaken belief, that he so intended. As the prisoner alone positively knew the state of his own mind on that point, and he did not bring forward the idea of such a belief having been entertained by him, the court and jury could not presume it. Moreover, it has often been decided that according to the constitution of this Court, we cannot reverse a judgment, because it does not appear in the record that the verdict ought to have been given, but only for error apparent in the decision of the court.
Therefore, an omission, merely to give instructions that might have been proper, if asked, is not error, but only the giving wrong instructions, or the refusing right ones when asked. We do not know in this case, that the judge did not submit this inquiry to the jury; for the evidence and occurrences at the trial are not fully set forth in any case, but the appellant states only so much as is material to the points on (417) which he excepts to the opinion of the court. But at all events, it does not appear, that the prisoner prayed any instructions on this point, and therefore he cannot complain of the omission. There is no error in the judgment; which will be certified to the Superior Court.